**UXB SAND & GRAVEL, INC.**

v.

**ROSENFELD CONCRETE CORPORATION et al.**

**92–447–Appeal.**

Supreme Court of Rhode Island.

May 4, 1994.

John F. Bomster, W. James McKay, William Russo, Adler, Pollock & Sheehan, Providence, for plaintiff.

Robert Fine, Licht & Semonoff, Providence, for defendants.

## OPINION

LEDERBERG, Justice.

This case came before the Supreme Court on appeal by UXB Sand & Gravel, Inc. (UXB), from a judgment of the Superior Court that granted the motion of Rosenfeld Concrete Corporation, Judith P. Parker, D. Barry Parker, and Myrtle Elizabeth Price (defendants) for a directed verdict and granted the defendants' subsequent motion for a new trial. In addition, attorneys' fees were awarded to the defendants. The primary issue on appeal is whether the statute of frauds precluded enforcement of an alleged agreement between UXB and Judith P. and D. Barry Parker (Parkers) for the sale of certain real property belonging to the Parkers. For the reasons stated herein, we affirm the trial justice's judgment regarding the motion for the directed verdict, and vacate the award of attorneys' fees to the defendants.

## I

## FACTS

The evolution of this case began in the summer of 1984 when Judith P. Parker contacted Jackson Despres (Despres) to determine whether he would be interested in excavating high-grade, bank-run sand and gravel from her Uxbridge, Massachusetts property (property). Despres and Charles Tasca (Tasca), coowners of UXB (formed in 1984), first visited the property in August 1984. Immediately after touring the property, Despres and Tasca met with the Parkers and agreed to buy 300,000 yards of gravel (first gravel deposit) over a four-year period for $1 per cubic yard and also to buy gravel from a second gravel deposit (second gravel deposit), if one could be identified, for $1 per cubic yard. A few days later, Tasca and Despres tendered to the Parkers two checks totaling $5,000, as a deposit. In December 1984, UXB and the Parkers memorialized the terms of their August agreement in writing (December 1984 agreement). The written contract, as amended by a side letter agreement, gave UXB an option to purchase the second gravel deposit during the term of the December 1984 agreement and, in the alternative, the right of first refusal to purchase the second gravel deposit for $1 per cubic yard.

Toward the end of the four-year term of the December 1984 agreement, the Parkers decided to sell the property outright and move to Florida. Hence, in November 1988—approximately one month prior to the end of the agreement—they forwarded to UXB a letter (November 1988 letter) offering UXB the opportunity to purchase the remaining gravel on the property or to purchase the property itself "by signing a pur-

chase and sale agreement for the gravel or the entire parcel."

That same month the Parkers notified UXB that they had received an offer of $1.3 million from Hood Construction and a $1.44 million offer from Rosenfeld Concrete Corporation (Rosenfeld). UXB apprised the Parkers that it, too, was interested in acquiring the property. On November 28, 1988, UXB and the Parkers executed another signed, written agreement (November 1988 agreement) concerning their rights and obligations under the December 1984 agreement. The November 1988 agreement provided, in part, as follows: "UXB agrees to exercise its right of first refusal set forth in the [December 1984 agreement] on or before December 19, 1988."

On December 16, 1988, UXB notified the Parkers of its intent to exercise its right of first refusal to purchase the second gravel deposit. The parties began negotiations to finalize the transaction, and they were able to agree on all terms except the issue of who had the obligation to secure a permit for the removal of gravel from the second gravel deposit.

Prior to resolving this issue, UXB offered to purchase the entire property for $1.2 million. Although the Parkers viewed the purchase and sale of the property as the best way to resolve the right-of-first-refusal dispute, their February 13, 1989 letter of response indicated that UXB's offer was inadequate but negotiable. UXB responded by raising its offer to $1.25 million, but negotiations continued on other issues.

On March 1, 1989, the Parkers, under a cover letter signed by their attorney, Ralph Kinder (Kinder), sent to UXB two proposed purchase-and-sale agreements calling for a total cash deposit of $62,500. Each agreement referred to a separate and distinct portion of the property. The property contained forty-two acres and consisted of a gravel pit and a residential portion. Although these proposed agreements were never executed by either party, negotiations continued.

On March 13, 1989, the Parkers forwarded to UXB a second set of proposed purchase-and-sale agreements also under a cover let-

ter signed by Kinder. The letter reflected UXB's dissatisfaction with the deposit requirement specified in the March 1, 1989 proposed agreements. The March 13, 1989 proposals suggested a lower but mandatory deposit of $30,000.

As it had done with the March 1, 1989 proposals, UXB also refused to sign this set of proposed agreements, for "[t]here were additional items that [UXB] felt warranted some additional discussion." The Parkers became frustrated with UXB's second rejection. As of March 24, 1989, no agreement had been reached. In an effort to resolve the disputes, UXB and the Parkers met on March 30, 1989. According to UXB, the parties resolved their differences at this meeting, including the deposit disagreement. The Parkers, however, felt that no agreement had been reached, especially regarding the deposit issue. Indeed, no written agreement was executed at this meeting or anytime thereafter. The Parkers subsequently sold the property to Rosenfeld on April 12, 1989.

In response, UXB filed a nine-count complaint in the Providence County Superior Court, seeking, *inter alia*, damages for breach of contract, fraud, and tortious interference with a contract. UXB later amended its complaint by adding two counts that alleged violations of the Rhode Island Antitrust Act, G.L.1956 (1992 Reenactment) §§ 6–36–4 and 6–36–5. The trial justice granted summary judgment in favor of defendants on the antitrust counts. UXB appealed to this court, and on November 19, 1991, we affirmed the entry of partial summary judgment and remanded the remaining counts to the Superior Court. *UXB Sand & Gravel, Inc. v. Rosenfeld Concrete Corp.*, 599 A.2d 1033, 1038 (R.I.1991). In 1992, UXB again amended its complaint, reducing the number of counts to five. Counts 1 and 2 alleged breach of contract arising from the Parkers' sale of the property to Rosenfeld and the Parkers' refusal to allow UXB to extract and remove additional gravel from the property. Count 3 charged that the Parkers' conduct amounted to a breach of the duty of good faith and fair dealing. Counts 4 and 5 charged Rosenfeld with tortious inter-

ference with contractual relations. Rosenfeld counterclaimed, seeking damages from UXB for slander.

At the conclusion of trial in 1992, the jury returned a special verdict that awarded UXB $2 million after finding that the Parkers breached an agreement to sell the property to UXB, and awarded UXB $200,886 because the Parkers breached an agreement with UXB when they sold the second gravel deposit to Rosenfeld and thereby breached the covenant of good faith and fair dealing. The jury found in favor of Rosenfeld on the tortious-interference claims and in favor of UXB on Rosenfeld's counterclaim.

On July 30, 1992, the trial justice granted defendants' motion for directed verdict on counts 1, 2, 3, and 4 and granted their alternative motion for a new trial on counts 1, 2, and 3 and on Rosenfeld's counterclaim. The trial justice also awarded defendants $107,-382.85 in attorneys' fees. UXB again responded with an appeal to this court pursuant to G.L.1956 (1985 Reenactment) § 9–24–1.

On appeal UXB primarily contended that the trial justice erred in ruling that because it failed to comply with the statute of frauds, UXB failed to establish breach of an agreement to sell the property to UXB.

We conclude that the trial justice properly directed a verdict on this claim.

II

## BREACH OF THE "AGREEMENT"

Our starting point is clear:

"In reviewing the trial justice's decision on a motion for a directed verdict, this court is bound by the same rules that govern the trial justice. We must examine all the evidence in the light most favorable to the nonmoving party without considering the weight of the evidence or the credibility of the witnesses. We must draw from that evidence only those reasonable inferences that support the position of the opposing party." *Rodrigues v. Miriam Hospital,* 623 A.2d 456, 460 (R.I.1993).

If such an examination discloses competent, credible evidence in support of UXB's claim,

then the motion for the directed verdict should have been denied. *Achille v. Colonial Penn Insurance Co.,* 505 A.2d 1173, 1174–75 (R.I.1986).

Rhode Island's statute of frauds, G.L.1956 (1985 Reenactment) § 9–1–4, provides in part that "[n]o action shall be brought * * * to charge any person upon any contract for the sale of lands * * * unless the promise or agreement upon which such action shall be brought, or some note or memorandum thereof, shall be in writing, and signed by the party to be charged therewith, or by some other person by him thereunto lawfully authorized."

It is undisputed that UXB never executed a written agreement for the purchase of the property. Unfortunately, this fact standing alone falls far short of resolving the issue before us.

## A. THE MARCH 13 COMMUNICATION

■ In support of its position that the trial justice misapplied the statute of frauds, UXB asserted that the March 13 cover letter signed by the Parkers' attorney, coupled with the accompanying unsigned purchase-and-sale agreements, "signified the Parkers' agreement to all elements essential to a contract or agreement for the sale of land" and thus satisfied the statute of frauds. It is well established that "[t]he statute of frauds does not require contracts for the sale of land to be in writing[,]" but if such a contract be an oral agreement, it will be enforced only if evidenced by a "sufficient memorandum." *Preble v. Higgins,* 43 R.I. 10, 16, 109 A. 707, 710 (1920). *See Durepo v. May,* 73 R.I. 71, 76, 54 A.2d 15, 18 (1947). Furthermore, such a memorandum need not comprise a single writing: essential terms of a sale can be included in the writing itself or by a reference in that writing to another document which supplies the missing information. *Cunha v. Callery,* 29 R.I. 230, 231–32, 69 A. 1001, 1001 (1908). Moreover, the requisite signature need not be that of the party to be charged, provided an authorized agent intends by signing to vouch for the accuracy of

the terms of the agreement.[1] *MacKnight v. Pansey,* 122 R.I. 774, 785, 412 A.2d 236, 242 (1980).

■ Despite the flexibility of § 9–1–4, it remains axiomatic that in order to satisfy the statute of frauds, a memorandum must contain evidence that "a contract has been made by [the parties] or offered by the signatory [of the memorandum] to the other [party]." 2 E. Allan Farnsworth, *Farnsworth on Contracts* § 6.7, at 136 (1990). *Accord Pamfiloff v. Giant Records, Inc.,* 794 F.Supp. 933, 936 (N.D.Cal.1992); *Thornton v. Kelly,* 11 R.I. 498, 500 (1877); Restatement (Second) *Contracts* § 131 (1981). *See FMC Finance Corp. v. Reed,* 592 F.2d 238, 242–43 (5th Cir.1979). A contract exists when each party has manifested an objective intent to promise or be bound. *Smith v. Boyd,* 553 A.2d 131, 133 (R.I.1989); 1 E. Allan Farnsworth, *Farnsworth on Contracts* § 3.6, at 169 (1990). A writing devoid of such an intent fails to prove the existence of a contract, *Read v. Henzel,* 67 A.D.2d 186, 189, 415 N.Y.S.2d 520, 523 (1979), and therefore does not satisfy the statute of frauds, *Centredale Investment Co. v. Prudential Insurance Company of America,* 540 F.2d 16, 18–19 (1st Cir.1976). *See Sholovitz v. Noorigian,* 42 R.I. 282, 285, 107 A. 94, 95 (1919) (writing must manifest parties' "respective intention to sell and to purchase" to satisfy statute of frauds). A determination that the March 13 communication failed to objectively manifest an intent on the part of the Parkers to be bound therefore mandates a conclusion that the statute of frauds has not been satisfied. *See Centredale Investment Co.,* 540 F.2d at 18–19.

Examination of the March 13 letter and proposed purchase and sale agreements revealed that instead of attesting to the Parkers' intention to be bound to sell the property to UXB, the documents clearly disclosed that the Parkers did *not* possess an intent to be bound. The letter from Kinder indicated that instead of accepting the terms of the March 1 proposed agreements, UXB had "suggested revisions," *most of which* the Parkers "acknowledged" in their March 13 proposed agreements. The letter also manifested disagreement over what cash deposit, if any, was required. In this regard, the letter merely reflected a problem that plagued the parties throughout their negotiations. UXB admitted that it never offered a cash deposit beyond the original $5,000 but contended that the deposit issue was resolved at the March 30 meeting. In any event, to the extent the March 13 letter indicated that negotiations were still ongoing, the letter conveyed that the Parkers possessed no intent to be bound. *See Read,* 67 A.D.2d at 189, 415 N.Y.S.2d at 523.

Furthermore, the letter indicated that as of March 13, the Parkers looked forward to consummating the purchase and sale of the property at *some future date* and that although they viewed the proposed contract terms as "reasonable," they contemplated execution of a formal written contract in the future. Thus, the March 13 correspondence further evidenced that the Parkers did not intend to be legally bound at that time. *See Boyd,* 553 A.2d at 134; *O'Donnell v. Smith,* 123 A. 291, 291–92 (1924); 1 Farnsworth, § 3.8 at 178–79. Obviously, had the Parkers intended to be bound to sell the property, they could have signed the proposed March 13 purchase-and-sale agreements. They chose not to sign.

Instead of manifesting the existence of a contract between UXB and the Parkers, the March 13 correspondence indicated that the Parkers did not intend to be bound prior to the execution of a formal contract. Consequently, the March 13 communication did not satisfy the statute of frauds. *Green v. Interstate United Management Services Corp.,* 748 F.2d 827, 830 (3d Cir.1984); *Conaway v.*

---

1. For an agent's signature to satisfy the statute of frauds, the agent must have actual or ostensible authority to sign the writing and must act pursuant thereto in order to bind his or her principal. 72 Am.Jur.2d *Statute of Frauds* § 379 (1974). In Rhode Island, an agent's authority to bind the principal need not be in writing. *Preble v. Higgins,* 43 R.I. 10, 14, 109 A. 707, 709 (1920). At oral argument, UXB has alleged—and defendants have denied—that Kinder was an agent with the requisite authority to bind the Parkers under G.L.1956 (1985 Reenactment) § 9–1–4. Even though neither side pressed the issue in its brief, we note that our review of the record indicates that Kinder acted only as an intermediary for the Parkers and lacked the authority to bind them to sell their property by his signature alone.

*20th Century Corp.,* 491 Pa. 189, 201, 420 A.2d 405, 411 (1980). To hold otherwise would conflict sharply with this court's policy of affording parties to business transactions the freedom "to negotiate without fear that they will be bound by mere discussion." *Boyd,* 553 A.2d at 134.

### B. JUDITH P. PARKER'S IN-COURT TESTIMONY

■ UXB argued in the alternative that even if the March 13 communication was deficient for purposes of the statute of frauds, Judith P. Parker cured any deficiencies by admitting in court all the terms essential to a contract's validity. A writing that, standing alone, does not comport with § 9–1–4 can nevertheless satisfy the statute of frauds if in-court admissions of the party to be charged supply the missing elements. *Peacock Realty Co. v. E. Thomas Crandall Farm, Inc.,* 108 R.I. 593, 600–02, 278 A.2d 405, 408–10 (1971). In fact, the absence of any writing at all does not render a contract *per se* unenforceable if "the party to be charged admits *all* of the terms essential to the validity of [a] contract." *Adams–Riker, Inc. v. Nightingale,* 119 R.I. 862, 867, 383 A.2d 1042, 1045 (1978).

■ Judith P. Parker's in-court testimony, however, fell far short of establishing an objective intent to be bound. *See Boyd,* 553 A.2d at 134. Her testimony disclosed that she had no intention of committing herself to sell to UXB prior to receipt of a cash deposit and execution of a written purchase-and-sale agreement. In fact, Judith P. Parker testified that at the March 30 meeting, she told Despres, "No deposit, no deal." Judith P. Parker's in-court declarations are supported by the November 1988 letter, which specified that UXB could purchase the property "by signing a purchase and sale agreement," and by the March 13 letter, which, as discussed *supra,* expressed the Parkers' intent to execute a formal written contract. Despres himself admitted that he fully expected to sign a purchase-and-sale agreement but nev-

er executed one because additional items, including the deposit, warranted discussion.

Accordingly, because neither the March 13 correspondence nor Judith P. Parker's in-court testimony establishes an objective intent to be bound, the alleged agreement for purchase and sale of the property is unenforceable because it fails to comply with the statute of frauds. *See* 553 A.2d at 132–34. We conclude, therefore, that the trial justice properly granted defendants' motion for a directed verdict.[2]

### III

### AWARD OF ATTORNEYS' FEES

In awarding $107,382.85 in attorneys' fees (the sum agreed to by the parties) to be paid by UXB to defendants, the trial justice reasoned that because the statute of frauds clearly had not been complied with, UXB should not have filed suit. The trial justice also opined that Despres had been less than "totally honorable and credible" and had delayed agreement in an effort to lower the Parkers' selling price.

■ It may be argued, of course, that UXB should have refrained from bringing suit. Perhaps the protracted history of this case, which began in May 1989 and has reached this court once before, exasperated the trial justice and reinforced his conclusion that UXB's claims were frivolous. In any event, in deciding whether to award attorneys' fees pursuant G.L.1956 (1985 Reenactment) § 9–1–45, as amended by P.L.1990, ch. 371, § 2, the court must determine whether "there was a complete absence of a justiciable issue of either law or fact." We are of the opinion that the question of whether the statute of frauds was satisfied presented a justiciable issue even though the evidence eventually proved to be legally deficient. At a minimum, UXB might have been able to establish the existence of a contract through Judith P. Parker's in-court testimony. *See Boyd,* 553 A.2d at 133. Accordingly, we vacate the award of attorneys' fees to the defendants.

2. We note that UXB did not challenge the trial justice's decision to grant a new trial in favor of

Rosenfeld on its counterclaim for slander.

Therefore, UXB's appeal of the judgment for directed verdict is denied and dismissed. The award of attorneys' fees to the defendants is vacated, and the papers in this case are remanded to the Superior Court.